*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CARNEGIE WOODS PROPERTY OWNERS
ASSOCIATION,

        Plaintiff/Counterdefendant-
Appellee/Cross-Appellant,

v

BRAD CZAJKA,

        Defendant/Counterplaintiff-
Appellant/Cross-Appellee.

UNPUBLISHED
November 17, 2025
12:05 PM

No. 371756
Mackinac Circuit Court
LC No. 23-008807-CH

Before: ACKERMAN, P.J., and YOUNG and KOROBKIN, JJ.

PER CURIAM.

Defendant/counterplaintiff-appellant/cross-appellee Brad Czajka owns property inside Carnegie Woods Subdivision (Lot 1), and an additional property outside of but adjacent to Carnegie Woods Subdivision (Lot 0). The Carnegie Woods Property Owners Association ("the Association") filed suit against Czajka, raising concerns about his use of Lot 1 and Carnegie Trail, the road within the subdivision. After a three-day bench trial, the Mackinac Circuit Court decided partially in the Association's favor. Czajka appeals as of right the July 2, 2024 amended final order of the trial court, arguing the trial court erred in dismissing his prescriptive easement and breach of fiduciary duty counterclaims. On cross-appeal, the Association argues the trial court's permanent injunction should have further restricted Czajka's use of Carnegie Trail, that the trial court erred in dismissing its trespass and slander of title claims, and that it is entitled to prevailing party attorney fees. For the reasons set forth in this opinion, we affirm.

## I. FACTUAL BACKGROUND

Lot 0 and Lot 1 are located in Naubinway, Mackinac County, Michigan, an Upper-Peninsula community along the coast of Lake Michigan. Lot 0 is adjacent to the Carnegie Woods Subdivision, and Lot 1 borders Lot 0 but is inside the subdivision. The subdivision, where property is subject to the bylaws of the Association pursuant to deed restrictions, is comprised of residential

lots abutting Lake Michigan, each accessible by a private, unpaved gravel road named Carnegie Trail:



*This labeled image of Plaintiff's Trial Exhibit J is included in this opinion to provide clarity with respect to the layout of the land in question and the parcels contained therein. The boundary lines of the properties are not precisely accurate or to scale.*

The incorporation documents for the Association are accompanied by a Proprietor's Certificate, which gives each lot owner in the subdivision an easement over Carnegie Trail; it provides:

> CARNEGIE INVESTMENT CORPORATION OF MICHIGAN, A CORPORATION DULY ORGANIZED AND EXISTING UNDER THE LAW OF THE STATE OF MICHIGAN BY WILLIAM L. CARNEGIE, PRESIDENT[,] AND CLAIRE L. CARNEGIE, SECRETARY, AS PROPRIETOR, HAS CAUSED THE LAND TO BE SURVEYED, DIVIDED, MAPPED AND DEDICATED AS REPRESENTED ON THIS PLAT AND THAT **CARNEGIE TRAIL IS PRIVATE AND FOR THE USE OF THE LOT OWNERS OF CARNEGIE WOODS SUBDIVISION ONLY** OR ANY OTHER OWNER WHERE TITLE IS TRACEABLE TO THIS PROPRIETOR . . . .

Czajka, a Birmingham resident, originally owned Lot 44 inside the subdivision, but was interested in purchasing a different property inside the subdivision with "more privacy" and "more seclusion." At the time, he was also negotiating the purchase of Lot 0 outside the subdivision from Harlan and Claudia Maurer.[1] Lot 0 is accessible through a small cattle gate installed by the Association at the end of Carnegie Trail. Czajka sent a letter to the Association dated July 3, 1995,

---

[1] The Maurers owned a large parcel of land west of the subdivision and sold a portion of it, Lot 0, to Czajka. The last name "Maurer" is also spelled "Mar" and "Mauer" throughout the lower court file. The Maurers were never a party to this case, for reasons explained later in this opinion, but because legal documents in the lower court file dated before the filing of this lawsuit spell the name "Maurer," we will use that spelling throughout.

wherein he wrote that he intended to purchase Lot 0 from the Maurers, and encouraged the Association to obtain a legal opinion on "the land-lock laws of the state of Michigan and the potential implications of the sale of [Lot 0]." Czajka also wrote that once negotiations for Lot 0 concluded, he "may request an opportunity to address the Association members to explore ideas that might be to our mutual advantage."

Czajka ultimately purchased Lot 0, and a reciprocal easement agreement ("the Maurer Easement") was included in the closing documents Czajka signed. The agreement established a driveway easement across the Maurers' neighboring property and Czajka's Lot 0 to Carnegie Trail. The purpose of the easement was to connect the Maurers to Carnegie Trail and Czajka to land and roadways west of the Maurers' property, giving both properties access to "public roadways." Czajka testified that he signed the easement agreement because it was part of the portfolio of closing documents and that he had no intent to harm the Association by signing it. A title company recorded the closing documents in the Mackinac County Register of Deeds at Liber 392, Pages 509-513, on September 11, 1995.

Czajka later sold Lot 44 and purchased Lot 1 inside the subdivision by land contract on September 8, 1998. When he purchased Lot 1, Czajka agreed to the Association's Declaration of Covenants and Restrictions, including:

> 1. To develop and maintain an area which is consistent and harmonious in design with the natural surroundings, **all proposed development shall be submitted to the Architectural committee of Carnegie Woods Property Owners Association for review and approval.**
>
> &ast; &ast; &ast;
>
> 3. The Architectural committee agrees to use its reasonable, best efforts to review as promptly as circumstances permit, all plans and specifications submitted to it in good faith. Such plans and specifications must set forth in reasonable detail . . . **location of drives**, culverts, septic tanks, drain field and water well, **location of all trees in excess of six inches in diameter at breast height which are to be removed**, exterior appearance of all improvements when completed, **grading and site arrangements**, and such other details as may be reasonably requested. Failure of the Architectural committee to accept or reject any plan of proposed development within sixty days from the date of submission shall be deemed to constitute approval of such plan.
>
> 4. Only one single family residence and necessary outbuildings . . . may be built on any parcel and no parcel is to be used for any commercial or business purposes whatsoever.
>
> &ast; &ast; &ast;
>
> 22. . . . If any lot owner, his heirs, successors, assigns, or any other occupant shall violate or attempt to violate any of the covenants or restrictions herein contained, it shall be lawful for the [Association] . . . to initiate and prosecute proceedings in any

court of competent jurisdiction against the person or persons violating or threatening to violate the same, **either to prevent such violation or to recover damages therefore**.

A few years later, the Association sought a legal opinion on how Czajka, as owner of Lot 1, would be allowed to access Lot 0. In a letter to the Association dated February 19, 2001, Attorney Peter Tazelaar opined that by virtue of his ownership of Lot 1, Czajka was allowed to access Lot 0 directly via Carnegie Trail. Tazelaar also warned of activity on Lot 0 potentially expanding the scope of the grant in the Proprietor's Certificate to benefit nonmembers of the Association.

Lot 0 and Lot 1 had no permanent structures on them at the time of purchase, but Czajka testified there was a driveway off Carnegie Trail leading into Lot 1 when he purchased it. He testified he visited Lot 1 and Lot 0 "once or twice a month" in the summer, and less frequently in the winter, consistently for 25 years. While on the property, Czajka said he and his family members would build campfires on and walk along the beach, and he typically did not see other Association members while visiting his properties. Czajka's friend, Robert Kufta, testified Czajka relocated to Utah for his job "for several years," and visited his properties less often than when he was living in Birmingham. Czajka said that in order to access Lot 0, he "more often than not" drove down Carnegie Trail, parked his vehicle on the driveway on Lot 1, then walked onto Lot 0 from inside Lot 1. Czajka testified he could not get to Lot 0 from the west because a gate on the Maurer property prevented access.

Other members of the Association used Carnegie Trail to directly access the old logging trail on Lot 0 for recreational activities. Czajka said "[t]here was all kind[s] of tracks relative to tire tracks with ATVs. There were snowmobile tracks during the wintertime. There was ample evidence that it was frequently being used for recreational purposes or otherwise." Some members did not know Czajka owned Lot 0, and thought it was state-owned forest land they were entitled to access as Association members. Some members testified there was nothing in the last 25 years that would have put them on notice that Czajka was using Carnegie Trail and/or Lot 1 to access Lot 0.

On January 17, 2020 Czajka obtained a building permit from Garfield Township to construct a pole barn on Lot 0, and around that time he put up signs and sent an email to Association members asking that they stay off Lot 0. He closed the gate to the old logging trail, and hired a contractor in June 2021 to prepare Lot 0 for development, including removing trees on Lot 1, repairing and grading the existing sand driveway on Lot 1 to ensure it could handle the weight of commercial trucks headed for Lot 0, and clearing the areas on Lot 0 where Czajka wanted to build the home and pole barn. The contractor did not do any work on Carnegie Trail itself. Czajka admitted that he did not submit any plans or specifications to the architectural committee for any work to be done on Lot 1 and insisted he had no intention of developing anything on Lot 1. Czajka did testify, however, that he gave Stesney, the head of the architectural committee, written notice of his plan to remove trees on Lot 1 in the summer of 2021. This written notice is not in the lower court file.

Czajka admitted that the trees removed on Lot 1 were six inches or greater in diameter at breast height,[2] but did not agree that his actions violated the Association's bylaws and deed restrictions because "[t]here was no development going on in Lot [1]." Terry Hamilton, the Association's former secretary, testified that Czajka participated in conference calls with the Association's board members to try to resolve the issue of Czajka removing trees without the architectural committee's approval. Hamilton said Czajka would not cooperate with the Association.

On September 23, 2022, William Burnett, the Association's president, emailed Czajka, stating: "I've noticed that there is development activity down on or around [Lot 1]. Please communicate your intentions and what the culmination of this development activity will result in." Czajka did not respond. On October 3, 2022, Stesney, on behalf of the Association, mailed a letter[3] to Czajka's notifying him of the following:

YOU ARE HEREBY NOTIFIED THAT USE OF CARNEGIE TRAIL (THE ROADWAY FROM US 2 TO THE WEST END OF CARNEGIE WOODS SUBDIVISION) IS PROHIBITED FOR:

1. TRANSPORTING FILL, CONSTRUCTION MATERIAL, CONCRETE TRUCKS OR OTHER DELIVERY TRUCKS;

2. USE BY CONTRACTORS SERVICING LAND WEST OF CARNEGIE WOODS SUBDIVISION;

3. TRANSPORTING PRE-ASSEMBLED BUILDINGS OF ANY KIND; OR

4. ANY INDIVIDUAL TO ACCESS ANY LAND WEST OF CARNEGIE WOODS SUBDIVISION.

Czajka did not respond to any of the Association's written communications, but stopped all development on Lot 0 and Lot 1 in 2022. The Association also did a title search in October 2022 on Lot 0 and Lot 1 in preparation for this lawsuit. That search revealed the Maurer Easement in the Mackinac County Register of Deeds. The Association was not aware of the Maurer Easement before the title search.

---

[2] Paragraph 3 of the Association's Declaration of Covenants and Restrictions prohibited the removal of "all trees in excess of six inches in diameter at breast height" without architectural committee approval.

[3] The letter is dated October 3, 2022 and its contents detail Burnett observing dump trucks unloading fill on the driveway of Lot 1, seeing grading/leveling equipment, and learning that fill had been deposited and leveled on the driveway leading from Lot 1 into Lot 0 in September 2022. But when introducing the letter at trial, the parties spoke as though the letter was sent in October 2021.

## II. PROCEDURAL HISTORY

On March 31, 2023, the Association filed a complaint against Czajka seeking a declaratory judgment (Count I) that Carnegie Trail is a private road for the exclusive use of property owners in the subdivision. It also sought injunctive relief (Count II) that would: (1) prevent Czajka, during the pendency of litigation, from using Carnegie Trail to access Lot 0, and prohibiting him from allowing other non-Association members to trespass onto Carnegie Trail either on his behalf, or for their own benefit; (2) declare the Maurer Easement invalid; and (3) order a permanent injunction prohibiting the use of Carnegie Trail for anyone other than lot owners and members of the Association. The Association also brought a claim for trespass (Count III) based on Czajka creating a driveway on Lot 1 into Lot 0 and allowing ingress and egress across Carnegie Trail, using Carnegie Trail to access Lot 0 directly, and granting an easement to the Maurers to do the same. Finally, the Association brought a claim for slander of title (Count IV) based on the Maurer Easement, which gave non-Association members access to Carnegie Trail from the west, and "extinguish[ed] a valuable 'exclusive use' right along the Carnegie Trail." The slander of title claim alleged that monetary damages were incurred by the Association in the form of legal fees to defend their titled rights to the exclusive use of Carnegie Trail, and because of the cost to repair Carnegie Trail after Czajka's construction traffic damaged it.

Czajka filed a counterclaim on May 23, 2023, asking for quiet title relief or declaratory relief (Count I) on the basis that he had established a prescriptive easement to use Carnegie Trail to access Lot 0; declaratory relief (Count II) that the Association has only a nonexclusive right to use Carnegie Trail and cannot bar Czajka from using it to access Lot 0; and damages (Count III) from the Association based on his claim that the Association breached fiduciary duties owed to Czajka by retaliating against him for restricting access to his private Lot 0, singling him out to enforce alleged bylaw violations without a good faith basis; and failing to include him in communications sent to all other Association members.

Also on May 23, 2023, the Association moved for a preliminary injunction seeking to enjoin Czajka from entering Carnegie Trail from the west through Lot 0 or Lot 1, alleging heavy equipment the contractor was using impacted Carnegie Trail and would cause irreparable harm. The Association complained that because Lot 0 was not subject to single-family residential restrictions, Czajka could build a commercial development that would result in an enormous increase in traffic on Carnegie Trail. The trial court denied the motion for a preliminary injunction, holding that as an owner of Lot 1, Czajka had an absolute right to use Carnegie Trail to access Lot 1, and to have construction trucks access Lot 1 via Carnegie Trail. The trial court also held that because the Association did not cite any specific evidence showing how heavy equipment would damage Carnegie Trail, it "cannot conclude that construction trucks would do irreparable harm to the road, when clearly construction trucks would otherwise be allowed to use Carnegie Trail if traveling to any subdivision lot." The trial court did not decide whether Czajka could access Lot 0 directly from Carnegie Trail at this time.

Czajka moved for summary disposition under MCR 2.116(C)(7), and (C)(10) on August 22, 2023. He argued under MCR 2.116(C)(7) (dismissal warranted by statute of limitations) that all of the Association's claims for injunctive or declaratory relief were barred by the 15-year statute of limitations under MCL 600.5801(4), and the slander of title claim was barred by the one-year statute of limitations under MCL 600.5805(11). Czajka argued under MCR 2.116(C)(10) (factual

sufficiency), that all of the Association's claims for declaratory and injunctive relief failed because there was no genuine dispute of fact that the Proprietor's Certificate only limits *who* may use Carnegie Trail, not *how* they may use it. Czajka also argued that he prevailed as a matter of law on his counterclaims for quiet title and declaratory relief because he could prove all elements of a prescriptive easement on the basis of undisputed facts. The trial court decided the only issue appropriate for summary disposition was the interpretation of the Proprietor's Certificate, holding on the basis of its language that Czajka could not use Carnegie Trail to access Lot 0 directly, but once on Lot 1, he could then access Lot 0. The trial court left the remaining factual issues regarding the prescriptive easement, breach of fiduciary duty, slander of title, and trespass claims for trial.

The parties proceeded to a bench trial beginning on October 30, 2023. Before hearing testimony, the trial court clarified that because the issue of a prescriptive easement had not been decided yet and would be after the presentation of proofs, the issue of whether Czajka could access Lot 0 directly via Carnegie Trail was still open. At trial, Burnett testified the Association was very concerned about the possibility of a commercial development so close to Carnegie Trail, and that two weeks before the start of trial, there was a zoning variance hearing for a property west of the Maurer Property for development of a "glampground." Burnett clarified that the reason the Association pursued a lawsuit was to prevent the use of Carnegie Trail to transport building materials to Lot 0 because the Association would need to pay for the damages that industrial trucks would cause to Carnegie Trail. The Association would otherwise have no problem with Czajka bringing the same trucks to Lot 1 if the work being done on Lot 1 was approved by the architectural committee. However Hamilton conceded at trial that it would be impossible to tell whether wear and tear on Carnegie Trail was attributable to tree cutting and other things Czajka was doing on Lot 1 and Lot 0 in the summer of 2021.

After the close of proofs, the trial court issued a memorandum of decision and order. In its findings of fact, the trial court found: "It appears that [the Association] had no issue with the use of Carnegie Trail to access Lot 0 for recreational purposes. Only after Czajka posted no trespassing signs did it become an issue, and once the work on Lot 1 occurred in 2021." The trial court held (1) the Association's slander of title claim was dismissed because it was barred by the statute of limitations,[4] (2) Czajka did not acquire a prescriptive easement to use Carnegie Trail to directly access Lot 0 from Carnegie Trail, (3) Czajka did not prove the Association breached any fiduciary duties it owed to him, and (4) Czajka's use of Carnegie Trail was not trespass because he used it consistent with the dedication in the Proprietor's Certificate. The trial court provided in an amended order that:

> 3. Czajka is permitted to continue to use Carnegie Trail to access Lot 1, and once on Lot 1 to access Lot 0. This is consistent with the Court's summary disposition order.
>
> 4. Czajka cannot grant third parties the right to use Carnegie Trail, except that, as owner of lot #1, he has the same rights as all other property owners in [the

---

[4] The statute of limitations for a slander of title claim in Michigan is one year. MCL 600.5805(11).

Association] to have family and friends, and commercial service providers use Carnegie Trail from US-2.

\* \* \*

5. Czajka cannot use Carnegie Trail for commercial purposes.

6. A permanent injunction shall be issued prohibiting all parties to access Lot 0 directly via Carnegie Trail.

7. Neither party fully prevailed; thus, no attorney fees or costs are awarded.

Czajka appeals from the amended memorandum of decision and order after bench trial. The Association timely filed a cross-appeal.

## III. PRESCRIPTIVE EASEMENT

Czajka argues on appeal that the trial court erred in deciding he did not establish a prescriptive easement to use Carnegie Trail to directly access Lot 0. We disagree.

"An action for a prescriptive easement is equitable in nature." *Mulcahy v Verhines*, 276 Mich App 693, 698; 742 NW2d 393 (2007). "This Court reviews de novo the trial court's holding in equitable actions." *Id*. (citation omitted). "Moreover, an action to quiet title is an equitable action that we also review de novo." *Marlette Auto Wash, LLC v Van Dyke SC Properties, LLC*, 501 Mich 192, 201; 912 NW2d 161 (2018). We also review a trial court's conclusions of law in a bench trial de novo. *Chelsea Inv Group, LLC v Chelsea*, 288 Mich App 239, 250; 792 NW2d 781 (2010). "In addition, this Court reviews the trial court's findings of fact for clear error." *Mulcahy*, 276 Mich App at 698 (citation omitted.) "A finding is clearly erroneous where, after reviewing the entire record, this Court is left with a definite and firm conviction that a mistake has been made. This Court is especially deferential to the trial court's superior ability to judge of the relative credibility of witnesses[.]" *Smith v Straughn*, 331 Mich App 209, 215; 952 NW2d 521 (2020) (cleaned up).

"Just as ownership of land may be acquired through adverse possession, so too may an easement be acquired through prescription." *Marlette Auto Wash*, 501 Mich at 202. "The elements necessary to give rise to a prescriptive right are the same as those of title by adverse possession, with the exception that it does not have to be exclusive." *Id*. (citation omitted). "An easement by prescription results from use of another's property that is open, notorious, adverse, and continuous for a period of fifteen years." *Plymouth Canton Community Crier, Inc v Prose*, 242 Mich App 676, 679; 619 NW2d 725 (2000); see MCL 600.5801(4). A prescriptive easement is "no more than an unopposed, continuous trespass [on another's property] for 15 years." *McDonald v Sargent*, 308 Mich 341, 344-345; 13 NW2d 843 (1944).

"The burden is on the party claiming a prescriptive easement to show by satisfactory proof that the use of the [] property was of such a character and continued for such a length of time that

-8-

it ripened into a prescriptive easement." *Mulcahy*, 276 Mich App at 699.[5] "The evidence offered in support of adverse possession must be strictly construed with every presumption being exercised in favor of the record owner of the land." *Rozmarek v Plamondon*, 419 Mich 287, 292; 351 NW2d 558 (1984) (citation omitted). This Court has acknowledged that what acts are sufficient to constitute adverse possession are dependent on the specific facts in each case and the character of the premises. *Burns v Foster*, 348 Mich 8, 14; 81 NW2d 367 (1957).

A party claiming entitlement to a prescriptive easement must do so by clear and cogent evidence, *Matthews v Natural Resources Dep't*, 288 Mich App 23, 37; 792 NW2d 40 (2010), which is an "exacting standard" that is more than a preponderance of the evidence, and approaches the level of proof beyond a reasonable doubt, *Astemborski v Manetta*, 341 Mich App 190, 199; 988 NW2d 857 (2022).

> [I]n an adverse possession case, for a party to establish possession by "clear and cogent evidence," the evidence must clearly establish the fact of possession and there must be little doubt left in the mind of the trier of fact as to the proper resolution of the issue. Thus, where there is any reasonable dispute, in light of the evidence, over the question of possession, the party has failed to meet his burden of proof. [*Id*. (cleaned up.)]

The Michigan Supreme Court has explained that continuity of use "can be stated only with reference to the nature and character of the right claimed." *St Cecelia Soc v Universal Car & Serv Co*, 213 Mich 569, 575; 182 NW 161 (1921) (quotation omitted) (holding that an easement for a driveway was acquired when the plaintiff "has driven over it when occasion required, and it has continuously claimed the right to do so"). See also *Mumrow v Riddle*, 67 Mich App 693, 696; 242 NW2d 489 (1976) (holding that where the easement claimed was a driveway from the road to the claimant's residence, the claimant's daily use of the driveway was continuous). It is not "required that a person shall use the easement every day for the prescriptive period. It simply means that he shall exercise the right more or less frequently, according to the nature of the use to which its

---

[5] On appeal, Czajka posits the Association has the burden of proof to establish there is no prescriptive easement, citing the following:

> [W]hen the parties seek a judicial determination conclusively settling their respective property interests, and the proponent of the alleged easement provides evidence that the easement has been used in excess of the 15-year prescriptive period by "many years," the burden of production is then shifted to the opponent of the easement to establish that the use was merely permissive. [*Marlette Auto Wash*, 501 Mich App at 207.]

However, *Marlette Auto Wash*, 501 Mich App at 207-208, goes on to cite caselaw where the easement has been in use for over 50 years. See *Loehr v Cochran*, 14 Mich App 345, 346; 165 NW2d 485 (1968), and *Widmayer v Leonard*, 422 Mich 280, 290; 373 NW2d 538 (1985). Thus, this burden-shifting would not seem to apply here, where the claimed use went on from 1995 to 2021, only 11 years beyond the 15-year statutory period.

enjoyment may be applied." *St Cecelia Soc*, 213 Mich at 577. Mere occasional or periodic trespass upon land, such as "casual hay cutting, amounting to a little more than an annual trespass[,] is not sufficient to warn the owner of the record title of a claim of adverse possession." *McVannel v Pure Oil Co*, 262 Mich 518, 525-526; 247 NW 735 (1933).

Because most residents in the Carnegie Woods Subdivision stayed at their properties only during the summer months, we cannot conclude Czajka's use was not continuous on the basis that he did not use Carnegie Trail to access Lot 0 year round. *St Cecelia Soc*, 213 Mich at 575. "[I]t is inherent that continuous use does not mean constant use. A pathway easement to a summer cottage is considered to be in continuous use if it is used merely seasonally. This use would be in keeping with the nature and character of the right claimed." *Dyer v Thurston*, 32 Mich App 341, 344; 188 NW2d 633 (1971). With that in mind, however, the record demonstrates that during the limited times Czajka visited his properties, he *rarely* used Carnegie Trail to directly access Lot 0.

Czajka averred at the summary disposition stage that he "continuously" used both the driveway on Lot 1 to access Lot 0, and Carnegie Trail to access Lot 0. But at trial, Czajka and Kufta's testimony established that Czajka visited his properties at least twice per month during the summer months consistently since 1995, and less frequently in the wintertime, amounting to at least six visits per year, and less when Czajka relocated to Utah for his job "for several years." Of those few times he would visit his properties yearly, Czajka testified that "more often than not," he drove down Carnegie Trail and parked his vehicle on Lot 1, then used the driveway inside Lot 1 to either drive onto or walk onto Lot 0. Czajka was also asked whether the old logging trail, accessible via the cattle gate separating Lot 0 from Carnegie Trail, was passable in the winter by vehicle. He responded: "If you can get through three or four feet of snow."

The trial court found: "There is evidence that Czajka used Carnegie Trail to access Lot 0 for recreational purposes[,]" and "Czajka typically parked on Lot 1, then accessed Lot 0 by foot. This was either done directly from Lot 1 or by using Carnegie Trail." There is no clear error in these findings of fact, but the trial court makes no conclusion of law as to continuity. Given the record, it is doubtful whether Czajka ever used Carnegie Trail to directly access Lot 0 more than once or twice annually. Put differently, the record reflects infrequent use of Carnegie Trail to directly access Lot 0, even bearing in mind Czajka's overall use of the properties was only periodic. Czajka has not established by clear and cogent evidence that he is entitled to a prescriptive easement over Carnegie Trail to directly access Lot 0 because he did not use Carnegie Trail to access Lot 0 continuously for the prescriptive period. Thus, we affirm the trial court's conclusion that there is no prescriptive easement on this basis.

## IV. INJUNCTIVE RELIEF

On cross-appeal, the Association asks that we remand this case for the trial court to enter a declaratory judgment and injunction stating while Czajka may use Lot 1 to enter Lot 0, Carnegie Trail cannot be used to benefit Lot 0, and that all of Czajka's future use of Lot 1 must be limited to single family residential use so that Lot 1 may not serve any access for the commercial purposes that may happen on Lot 0. The Association contends *Schadewald v Brulé*, 225 Mich App 26; 570 NW2d 788 (1997), controls, and we agree, but *Schadewald* does not help the Association achieve the relief it hopes for on appeal. We hold there is no error in the trial court's findings and affirm the permanent injunction.

We review a trial court's decision whether to grant injunctive relief for abuse of discretion. *Id*. at 39. "An abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome." *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006) (citation omitted). An abuse of discretion occurs when the trial court selects an outcome outside the range of reasonable and principled outcomes. *Id*. "A court by definition abuses its discretion when it makes an error of law." *Kidder v Ptacin*, 284 Mich App 166, 170; 771 NW2d 806 (2009) (cleaned up). "The extent of a party's rights under an easement is a question of fact, and a trial court's determination of those facts is reviewed for clear error." *Blackhawk Dev Corp v Village of Dexter*, 473 Mich 33, 40; 700 NW2d 364 (2005).

## A. APPLYING *SCHADEWALD V BRULÉ* TO INTERPRET THE LANGUAGE OF THE GRANT IN THE PROPRIETOR'S CERTIFICATE

"The rights of an easement holder are defined by the easement agreement." *Great Lakes Gas Transmission Co v MacDonald*, 193 Mich App 571, 575; 485 NW2d 129 (1992). Our Supreme Court laid out the steps to interpreting the scope of an easement in *Little v Kin*, 468 Mich 699, 700; 664 NW2d 749 (2003): "First, the trial court must determine whether the easement contemplates" the use at issue. "In answering this question, the trial court shall begin by examining the text of the easement. Where the language of a legal instrument is plain and unambiguous, it is to be enforced as written and no further inquiry is permitted." *Id*. (citation omitted). "The task of determining the parties' intent and interpreting the limiting language is strictly confined to the 'four corners of the instrument' granting the easement." *Blackhawk Dev Corp*, 473 Mich at 42 (citation omitted). "If the text of the easement is ambiguous, extrinsic evidence may be considered by the trial court in order to determine the scope of the easement." *Little*, 468 Mich at 700.

Because the Association relies heavily on *Schadewald*, we summarize it briefly here. Two families (the Schadewalds/plaintiffs and the Brulés/defendants) owned neighboring property near a creek. Because the Brulés' property was landlocked, they used a 20 foot easement across the western edge of the Schadewalds' property connecting the Brulés' property to a right of way that provided access to a public highway. The Brulés later purchased a property adjacent to and west of their landlocked property and the Schadewalds' property. *Schadewald*, 225 Mich App at 28. When the Brulés sought to build a garage on the adjacent property, the Schadewalds filed a complaint seeking to enjoin the Brulés from using the easement on the Schadewalds' property for access to the Brulés' adjacent lot. The Brulés built the garage on their adjacent lot anyway. The trial court later held the Brulés' use of the easement to reach the adjacent lot constituted a "technical misuse of the easement," but because the Schadewalds did not present evidence that the misuse increased the burden to the Schadewalds' property, there was no substantial or irreparable injury that warranted granting the Schadewalds' requested injunction. *Id*. at 31-32.

The Schadewalds appealed to this Court, arguing the trial court erred in permitting the Brulés to use the easement to access the adjacent lot. *Id*. at 35. The Brulés argued on appeal that they had not increased the burden on the easement, but according to this Court, "the pertinent question is not whether the burden on [the Schadewalds'] property has substantially increased, but rather whether [the adjacent lot] has any right to an easement over [the Schadewalds'] property." *Id*. at 38. Because the deed conveying the Schadewalds their property stated the grant was "subject to a right of way over the Westerly portion thereof to connect with the right-of-way to" the

-11-

highway, and did not mention any other parcel, this Court held as a matter of law that the easement on the Schadewalds' property did not extend to the adjacent lot, and that proof of a burden on the Schadewalds' property was not necessary to grant an injunction. *Id*. at 38-39. This Court held that the Brulés' use of the easement to benefit their adjacent lot would constitute trespass because it went beyond the reasonable exercise of the use granted by the easement, and warranted an injunction. It remanded the case for the trial court to enter an injunction prohibiting the Brulés from using the easement to benefit the adjacent lot. *Id*. at 40.

*Schadewald* was decided on the basis of the plain language of the easement, which stated it was for the benefit of one specific parcel. *Id*. The plain language of the proprietor's certificate here states: "CARNEGIE TRAIL IS PRIVATE AND FOR THE USE OF THE LOT OWNERS OF CARNEGIE WOODS SUBDIVISION ONLY." Similar to *Schadewald*, it unambiguously establishes that Carnegie Trail is for the exclusive benefit of one specific group of people: the Association lot owners, which included Czajka. And as stated, it does not limit *how* lot owners may use Carnegie Trail. So when Czajka is using Carnegie Trail to access Lot 1, he is using it to benefit himself as allowed by the plain language of the grant in the Proprietor's Certificate. Thus, the trial court's injunctive relief prohibiting Czajka from using Carnegie Trail to travel directly to Lot 0, but allowing unrestricted use if traveling to Lot 1, was proper.

## B. THE ASSOCIATION FAILED TO SHOW CZAJKA'S USE BURDENED CARNEGIE TRAIL

Having established that the grant in the Proprietor's Certificate permits Czajka, acting within his scope as the owner of Lot 1, to send commercial vehicles intended for Lot 0 down Carnegie Trail through Lot 1, we must determine whether that use "is permissible under the law of easements . . . . [T]he dominant estate may not make improvements to the servient estate if such improvements are unnecessary for the effective use of the easement or they unreasonably burden the servient tenement." *Little*, 468 Mich at 701.

Relying on *Schadewald*, the Association argues that allowing commercial vehicles down Carnegie Trail would increase the burden on Lot 1, the servient estate, and Carnegie Trail in a way not contemplated by the grant in the Proprietor's Certificate—which would warrant an extension of the injunction to prohibit this activity. But *Schadewald* did not reach a burden analysis because that case rose and fell on the language of the easement—this Court determined the use at issue was impermissible.[6] However, it did explain the principles of easement law: the "owner of an easement

---

[6] The Association also relies on *Soergel v Preston*, 141 Mich App 585, 367 NW2d 366 (1985), but that case also did not reach the burden analysis because it held the language of the easement did not contemplate the use at issue:

> [T]he initial question in this case is whether parcel C has any right to an easement. Nothing in the easement agreement entitles the owners of parcel C to benefit from the easement appurtenant to parcel B. The question of whether parcel C's use of the easement constitutes a material increase would not arise until the future owners of parcel B decided to take advantage of the easement as well. [*Id*. at 589.]

-12-

cannot materially increase the burden of it upon the servient estate or impose thereon a new and additional burden," and where there is "no easement by grant, reservation, way of necessity, or prescription, the burden on the servient estate could not be extended to an additional parcel . . . to a greater extent than was contemplated at the time of the creation of the easement." *Schadewald*, 225 Mich App at 36-37 (cleaned up). It went on to state in dicta:

> Even if the burden on [the Schadewalds'] property were at issue, the Brulés have not established that relief is unwarranted. The trial court found that travel over the easement was not materially increased by the use of the new garage. However, there is no empirical proof in the record that . . . an increased burden on [the Schadewalds'] servient estate could not arise in the future. [*Id*. at 39.]

The Association relies on this dicta in *Schadewald* to assert that it does not need to present evidence of an increased burden to Carnegie Trail because the increase could arise in the future if Czajka were to develop on Lot 0 commercially. But in *Smith v Edwards*, 249 Mich App 199, 2019; 645 NW2d 304 (2002), reviewing a motion under MCR 2.116(C)(10), this Court declined to extend *Schadewald* to grant the plaintiffs' requested relief: remand because the trial court erred when it granted summary disposition in favor of the defendants regarding the scope and use of an easement. This Court held there was no genuine issue of material fact regarding whether the use at issue materially altered the easement because the plaintiffs' attorney only made representations about the possible impairments to the easement, but failed to support those representations with affidavits, depositions, admissions, or other evidence. *Id*. at 209-211. From *Smith*, we hold at least some proof regarding whether the use at issue materially altered the easement is required to grant the requested relief.

On this record, there is no evidence that Czajka's use of Carnegie Trail to send commercial vehicles to Lot 1, then to Lot 0, would burden Carnegie Trail in a way not contemplated by the Proprietor's Certificate. Carnegie Trail is a dirt road that is graded and treated with calcium chloride yearly. The Association did not supply proof that anything Czajka was doing on Lot 0 increased the costs it already expends yearly to grade and maintain the road, and conceded that it was impossible to tell whether the wear and tear to Carnegie Trail was attributable to anything Czajka was doing on Lot 0 or Lot 1. The Association also stated it would have no issue with Czajka bringing the same commercial vehicles carrying building materials to Lot 1 if Czajka intended to develop on Lot 1. Finally, the Association's assertion that Czajka's use as allowed by the current injunction would transform Lot 1 into a commercial property is baseless. Czajka testified he had no intention of developing anything commercially on Lot 0 and only wanted to build a house and pole barn on it. And while the Association asserted a "glamp ground" development popped up near Lot 0, it was allegedly for a property to the west of the Maurer property, at least two parcels removed from the entrance to Lot 0 and far too attenuated for us to require the trial court to impose further injunctive relief. Thus, we affirm the trial court's permanent injunction.

## V. BREACH OF FIDUCIARY DUTY

The trial court, in rejecting Czajka's counterclaim for breach of fiduciary duty, found that that there was a clear violation of the Association's bylaws for work done without the architectural committee's approval. On appeal, Czajka not only denies he violated the Association's bylaws,

but argues that violating the bylaws was not sufficiently pleaded and was raised for the first time at trial without the opportunity for him to defend against any alleged violations, and that this amounted to a "trial by surprise." We disagree.

We review a trial court's conclusions of law in a bench trial de novo. *Chelsea Inv Group, LLC*, 288 Mich App at 250. "In addition, this Court reviews the trial court's findings of fact for clear error." *Mulcahy*, 276 Mich App at 698 (citation omitted.) "A finding is clearly erroneous where, after reviewing the entire record, this Court is left with a definite and firm conviction that a mistake has been made. This Court is especially deferential to the trial court's superior ability to judge of the relative credibility of witnesses[.]" *Smith*, 331 Mich App at 215. We also review a trial court's interpretation of corporate bylaws and restrictive covenants de novo. *Hillenbrand v Christ Lutheran Church of Birch Run*, 312 Mich App 273, 277; 877 NW2d 178 (2015), overruled in part on other grounds by *Winkler v Marist Fathers of Detroit, Inc*, 500 Mich 327; 901 NW2d 566 (2017); *Johnson Family Ltd Partnership v White Pine Wireless, LLC*, 281 Mich App 364, 389; 761 NW2d 353 (2008).

Michigan is a notice-pleading state. *Johnson v QFD, Inc*, 292 Mich App 359, 368; 807 NW2d 719 (2011). "A complaint must contain a statement of the facts, without repetition, on which the pleader relies in stating the cause of action, with the specific allegations necessary reasonably to inform the adverse party of the nature of the claims the adverse party is called on to defend." *Dalley v Dykema Gossett*, 287 Mich App 296, 305; 788 NW2d 679 (2010) (cleaned up). "[T]he primary function of a pleading in Michigan is to give notice of the nature of the claim or defense sufficient to permit the opposite party to take a responsive position." *Stanke v State Farm Mut Auto Ins Co*, 200 Mich App 307, 317; 503 NW2d 758 (1993), citing 1 Martin, Dean & Webster, Michigan Court Rules Practice, p 186. "[I]t is well settled that we will look beyond mere procedural labels and read the complaint as a whole when ascertaining the exact nature of a plaintiff's claims." *Johnson*, 292 Mich App at 368.

The Association alleged that by creating a driveway on Lot 1 to support commercial trucks driving into and building on Lot 0, Czajka was interfering with and causing damages to Carnegie Trail. Paragraph 6 of the facts section of the complaint made reference to the Association's bylaws, while paragraph 13 alleged that Czajka "opened a quasi-road from Lot 1 to the west to [Lot 0] outside of the Carnegie Woods Subdivision." Paragraphs 20 and 21, wherein the Association prays for a judgment declaring Carnegie Trail is a private road for the exclusive use of subdivision lot owners, stated:

> 20. Under the by-laws of the Carnegie Woods Property Owners Association, the Carnegie Trail was established as a road for the exclusive use of members of the Association, not to others beyond it and *details the process of obtaining a permit, receiving approval, being notified of a violation of subsequent rules regarding prosecution of members that violate these "rules" of the Association*.

> 21. The [Association] made inquiries to [Czajka] and *supplied notices by email and by certified mail about [Czajka]'s and other's activities on [Czajka]'s lot located within the Carnegie Woods Subdivision and on lots west of the Subdivision*.

Paragraph 32, wherein the Association pleaded a claim of trespass, states:

-14-

32. [Czajka] has interfered with the [Association's] use of Carnegie Trail by creating a driveway from his lot within [t]he Carnegie Woods Subdivision to his and other's properties to the west and allowing ingress and egress across [the Association's] roadway.

The facts alleged as the basis of the claims for injunctive relief and trespass reference Czajka improving the existing road on Lot 1. The statement of facts in the complaint also referenced the need to obtain a permit and receive approval before beginning construction on Lot 1, and that one could be prosecuted for violating bylaws and deed restrictions. Reading the complaint as a whole, the specific allegations reasonably, albeit imperfectly, informed Czajka that he may need to defend making improvements to Lot 1 without architectural committee approval. *Dalley*, 287 Mich App at 305; *Johnson*, 292 Mich App at 368. And while the Association's complaint did not mention tree cutting, such action was within the sphere of improvements made to Lot 1, and put Czajka on notice that he would need to defend against allegations that he violated the bylaws and deed restrictions. Thus, the Association sufficiently pled in order to develop proofs on the violations of the deed restrictions at trial, and this did not amount to the "trial by surprise" Czajka complains of on appeal.

Next, we address the merits of the breach of fiduciary duty claim. "[A] fiduciary relationship arises from the reposing of faith, confidence, and trust and the reliance of one upon judgment and advice of another." *Vicencio v Ramirez*, 211 Mich App 501, 508; 536 NW2d 280 (1995). "Relief is granted when such position of influence has been acquired and abused, or when confidence has been reposed or betrayed." *Id*. As Czajka points out, this Court has found that a fiduciary relationship exists between a property owners association and its members. See *Tuscany Grove Ass'n v Gasperoni*, unpublished per curiam opinion of the Court of Appeals, issued June 24, 2014 (Docket No. 314663), p 5 ("It highlights the fiduciary duty owed by the Association to the owners to ensure that uniformity is maintained through rule enforcement."). Czajka alleged the Association harassed him with claims that he violated the Association's bylaws and deed restrictions without a good faith basis, and in retaliation for withdrawing permission for other Association members to use Lot 0 for recreational activities. Finding no clear error in the trial court's fact finding, we affirm the trial court's holding that the Association did not breach its fiduciary duty.

The relevant bylaws and deed restrictions of the Association state that all development shall be submitted to the architectural committee for review and approval. All plans submitted to the architectural committee must set forth the location of drives to be developed, and the location of all trees in excess of six inches in diameter at breast height which are to be removed. If the committee failed to accept or reject any plan of proposed development within 60 days from the date of submission, the bylaws state the plan shall be deemed approved. The deed restrictions state that no parcel is to be used for any commercial or business purposes whatsoever. Finally, the bylaws warn that if the deed restrictions are violated, the Association would prosecute violators, "either to prevent a violation or to recover damages therefore."

However, Czajka admitted at trial that when he hired a contractor in 2021 to remove trees and repair the existing road on Lot 1 so it would remain passable by vehicle, he did not submit any plans or specifications to the architectural committee. And although Czajka said he gave Stesney, the head of the architectural committee, written notice of his plan to remove trees on Lot 1 in the

-15-

summer of 2021, this written notice is not in the lower court file and the trial court did not clearly err insofar as it did not find Czajka credible in this regard. The contractor testified he did over one week's worth of work on Lot 0 and Lot 1 in mid-June 2021 to prepare both sites for development on Lot 0. Czajka admitted that the trees the contractor removed on Lot 1 were six inches or greater in diameter at breast height, and the contractor testified he brought in gravel to grade the existing road on Lot 1 to handle the weight of trucks driving from Lot 1 to Lot 0. Without committee approval, these acts violated the plain language of the bylaws and deed restrictions, and the Association could have filed suit against Czajka in 2021 upon discovery of these violations.

Hamilton, the Association's former secretary, testified Czajka participated in conference calls with the Association's board members to resolve Czajka violating the deed restrictions. It is unclear whether these communications happened in 2021 or 2022. Hamilton said Czajka would not cooperate with the Association. In September 2022, Burnett, the Association's president, emailed Czajka, stating that he noticed development happening on Lot 1 and asked Czajka to communicate his intentions about developing on Lot 1 and Lot 0. Czajka did not respond. In October 2022, the Association mailed and e-mailed Czajka a letter notifying him that he was prohibited from using Carnegie Trail to send construction vehicles to Lot 1, from using Carnegie Trail for anything servicing Lot 0, or from allowing anyone using Carnegie Trail to travel directly to Lot 0. Czajka had not responded as of March 15, 2023, and a few weeks later, the Association filed this lawsuit. The evidence thus reflects that the Association tried to cooperate with Czajka from 2021 to 2023 as to his unique violations of the bylaws, and waited two years from the time Czajka violated the bylaws and deed restrictions to pursue this lawsuit. Given Czajka's unique status as the owner of both Lot 1 and Lot 0, taken together with the increased activity on both properties starting in 2021, the trial court did not err in concluding Czajka failed to establish a claim for breach of fiduciary duty.

## VI. SLANDER OF TITLE

The Association argues the trial court erred when it dismissed the slander of title claim on the basis of the statutory period of limitations expiring. We disagree.

We review a trial court's conclusions of law in a bench trial de novo. *Chelsea Inv Group, LLC*, 288 Mich App at 250. We also review de novo whether a claim is barred by the statute of limitations. *Stephens v Worden Ins Agency, LLC*, 307 Mich App 220, 227-228; 859 NW2d 723 (2014). "In addition, this Court reviews the trial court's findings of fact for clear error." *Mulcahy*, 276 Mich App at 698 (citation omitted.) "A finding is clearly erroneous where, after reviewing the entire record, this Court is left with a definite and firm conviction that a mistake has been made." *Smith*, 331 Mich App at 215.

A slander of title claim has a one-year period of limitations. See *Bonner v Chicago Title Ins Co*, 194 Mich App 462, 470; 487 NW2d 807 (1992) ("[T]he statute of limitations applicable to actions for libel and slander applies to actions for slander of title."); MCL 600.5805(11) (providing that "[t]he period of limitations is 1 year for an action charging libel or slander"). The accrual for such a claim occurs "at the time the wrong upon which the claim is based was done . . . ," MCL 600.5827, which is the time of publication, regardless of whether the defamed or slandered person is aware of the publication. *Equity Funding, Inc v Village of Milford*, 342 Mich App 342, 355-356; 994 NW2d 859 (2022), citing *Grist v Upjohn Co*, 1 Mich App 72, 81;

134 NW2d 358 (1965). Recording an easement is constructive notice of the existence of the easement. *Penrose v McCullough*, 308 Mich App 145, 153; 862 NW2d 674 (2014).

The Maurer Easement was filed on September 11, 1995, and the slander of title claim accrued on that date. The Association had until September 11, 1996 to file the claim, even though it was not aware of the Maurer Easement until it did a title search on Lot 0 in 2022. See *Equity Funding*, 342 Mich App at 356. But the Association accuses Czajka of fraudulent concealment of the existence of the Maurer Easement, and thereby the slander of title claim, under MCL 600.5855,[7] making the period of limitations any time within two years after the Association discovered the Maurer Easement. However, for this later accrual date to be valid, the Association was required to "plead in [its] complaint the acts or misrepresentations that comprised the fraudulent concealment," *Sills v Oakland Gen Hosp*, 220 Mich App 303, 310; 559 NW2d 348 (1996), and a review of the Association's complaint reveals that no such acts or misrepresentations are alleged. Therefore, the statute of limitations for the slander of title claim ran on September 11, 1996, so the trial court was correct to dismiss the slander of title claim.

Putting aside the Association's failure to plead fraudulent concealment in its complaint, the Association contends Czajka's July 3, 1995 letter to the Association said he would let them know of his plans with the Maurer Easement and that because he never got back to the Association, he fraudulently concealed the easement, making the accrual date of the slander of title claim sometime in October 2022, when the Association's title search revealed the Maurer Easement. But the Association mischaracterizes the contents of the letter, which merely stated Czajka intended to purchase Lot 0 from the Maurers, encouraged the Association to obtain a legal opinion on how his purchase of Lot 0 would affect the use of Carnegie Trail, and stated Czajka "may . . . address the Association members to explore ideas that might be to our mutual advantage." The letter did not mention any easement with the Maurers. Further, an allegation of fraud requires a "false statement relating to a past or existing fact." *Cummins v Robinson Twp*, 283 Mich App 677, 696; 770 NW2d 421 (2009). The letter from Czajka to the Association was sent in July 1995, and the Maurer Easement did not exist until August 1995 and was not recorded until September 1995. Thus, any argument that Czajka's letter represented a fraudulent concealment of the easement fails because the easement did not exist at the time.

## VII. TRESPASS

Next, the Association argues the trial court erred in dismissing its trespass claim. We disagree.

---

[7] MCL 600.5855 concerns fraudulent concealment of a claim, and states: "If a person who is or may be liable for any claim fraudulently conceals the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim, the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim, although the action would otherwise be barred by the period of limitations."

We review a trial court's conclusions of law in a bench trial de novo. *Chelsea Inv Group, LLC*, 288 Mich App at 250. The Association's complaint alleged that Czajka trespassed on Carnegie Trail when he created a driveway on Lot 1 and allowed ingress and egress across Carnegie Trail to Lot 1 to access Lot 0, and when he used Carnegie Trail to directly access Lot 0. The trial court's ruling on the trespass claim was twofold:

> The Court finds that Czajka has not committed a trespass. Travel to Lot 0 once on Lot 1 is permitted. His use of Carnegie Trail to Lot 0 has been for recreational purposes only. The Court has found that other [Association] members have used Carnegie [Trail] in the same fashion, and that use is not inconsistent with the dedication, and was permissive, mutual use.

On appeal, however, the Association argues that Czajka committed trespass on his own property when he cut down trees on Lot 1 in violation of the bylaws and deed restrictions. But this relief sounds in contract, not in tort.

"[A]n entity's bylaws or similar governing instrument will constitute a binding contractual agreement between the entity and its members." *Conlin v Upton*, 313 Mich App 243, 255; 881 NW2d 511 (2015). "A deed restriction represents a contract between the buyer and the seller of property." *Bloomfield Estates Improvement Ass'n, Inc v City of Birmingham*, 479 Mich 206, 212; 737 NW2d 670 (2007), whereas trespass is a tort. *Wiggins v City of Burton*, 291 Mich App 532, 555; 805 NW2d 517 (2011). "We have held that a tort action will not lie when based solely on the nonperformance of a contractual duty." *Fultz v Union-Commerce Associates*, 470 Mich 460, 466; 683 NW2d 587 (2004). There must be some breach of duty distinct from breach of contract, such as negligence or misfeasance, to support a tort claim. *Rinaldo's Const Corp v Mich Bell Telephone Co*, 454 Mich 65, 83; 559 NW2d 647 (1997) (cleaned up). "Misfeasance or negligent affirmative conduct in the performance of a promise generally subjects an actor to tort liability as well as contract liability for physical harm to persons and tangible things." *Id*. at 84 (citation omitted). "If a relation exists which would give rise to a legal duty without enforcing the contract promise itself, the tort action will lie, otherwise [it will] not." *Id*. (citation omitted). Czajka had no legal duty to seek permission to cut down trees and improve a driveway on his property that existed outside of the bylaws and deed restrictions. He is correct that a claim for violating deed restrictions sounds in breach of contract, not in trespass. Thus, the trial court did not err when it declined to rule on the trespass claim as it related to the cutting trees and improving the driveway on Lot 1.[8]

---

[8] Considering the facts alleged in the complaint as the basis for the trespass claim, the Association's claim would also fail because the statute of limitations for a trespass claim is three years. MCL 600.5805(2). The Association knew Czajka was using Carnegie Trail to access Lot 0 inconsistent with the dedication in the Proprietor's Certificate since at least 2001, when it sought a legal opinion from Tazelaar about on how Czajka, as owner of Lot 1, would be allowed to access Lot 0. The statute of limitations had run by the time the Association brought a trespass claim in 2023. Rather than deciding the claim on the merits, the trial court should have dismissed the claim on the basis that the statute of limitations had run. Regardless, we affirm where the right result was reached and the claim was dismissed, even if for the wrong reasons. *Etefia*, 245 Mich App at

On cross-appeal, the Association argues it is entitled to attorney fees.  We disagree.

The Association did not move in the trial court for prevailing party attorney fees related to its claim for injunctive relief, and did not move for attorney fees as a sanction under MCR 1.109(E).  These issues are therefore unpreserved.  *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227; 964 NW2d 809 (2020).  "In civil cases, Michigan follows the 'raise or waive' rule of appellate review. . . .  If a litigant does not raise an issue in the trial court, this Court has no obligation to consider the issue."  *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, 347 Mich App 280, 289; 14 NW3d 472 (2023).  Further, "issues involving statutory interpretation, as well as contract interpretation, present issues of law that are reviewed de novo."  *Tuscany Grove Ass'n v Peraino*, 311 Mich App 389, 393; 875 NW2d 234 (2015) (citation omitted).

The trial court held that because neither party fully prevailed, no attorney fees or costs were to be awarded.  Michigan follows the "American rule" which is that "attorney fees are not ordinarily recoverable unless a statute, court rule, or common-law exception provides the contrary."  *Smith v Khouri*, 481 Mich 519, 526; 751 NW2d 472 (2008) (citation omitted).  "Exceptions to the general rule are narrowly construed."  *Fleet Business Credit, LLC v Krapohl Ford Lincoln Mercury Co*, 274 Mich App 584, 589; 735 NW2d 644 (2007).  Attorney fees may be recovered if expressly provided for by contract.  *Id*.

Because the Association did not prevail on its trespass or slander of title claims, it is not entitled to attorney fees in pursuing these claims.  See MCL 565.108.  And because "[r]ecovery has been allowed in limited situations where a party has incurred legal expenses as a result of another party's fraudulent or unlawful conduct," *Brooks v Rose*, 191 Mich App 565, 575; 478 NW2d 731 (1991), the Association also argues it is entitled to attorney fees as a sanction under MCR 1.109(E) because Czajka's breach of fiduciary duty claim was frivolous.  But, as stated, the Association never moved in the trial court as required under MCL 600.2591(1) for the trial court to sanction Czajka and award such fees.  Further, the circumstances under which Czajka brought the breach of fiduciary duty claim do not meet the definition of "frivolous" in MCL 600.2591(3)(a)(i)-(iii)—arguably, the Association's prosecution seemed retaliatory because it did not have issues with Czajka using Carnegie Trail to access Lot 0 until Czajka asserted his right to exclude others from Lot 0, and never acted against any other Association member who used Carnegie Trail to access the old logging trail on Lot 0.  Thus, the counterclaim for breach of fiduciary duty was not brought to harass, embarrass, or injure, and was based on true facts not entirely devoid of legal merit.  MCL 600.2591(3)(a)(i)-(iii).

Finally, the Association claims it is entitled to attorney fees under paragraph 22 of the bylaws, which allows the Association to recover "damages" for violations of the deed restrictions.  If a property association's bylaws "specifically provide[]" for attorney fees, the trial court may award them even if there was no specific prayer for the recovery of attorney fees in the complaint.

---

470 ("[T]his Court will not reverse a trial court's order if it reached the right result for the wrong reason.").

*Fleet Business Credit*, 274 Mich at 589, 592. However, "contractual attorney's fees are recoverable only in a suit brought directly on the contract. Unlike statutorily permitted or rules-based attorney fees, contractually based attorney's fees form part of the damages claim." *Pransky v Falcon Group, Inc*, 311 Mich App 164, 194-195; 874 NW2d 367 (2015) (citation omitted). In other words, because the Association did not bring a claim for breach of contract regarding violating the deed restrictions, the trial court could not award attorney fees as damages because the award of attorney fees could only be authorized by the contract, and not any statute or court rule. Accordingly, the Association failed to sufficiently state a cause of action to recover attorney fees under the bylaws.

Further, paragraph 22 of the Association's bylaws in this case does not specifically authorize the recovery of "attorney fees" if the Association prevails on a claim; rather, it provides for recovery of "damages" generally. We conclude the trial court did not err in denying the Association attorney fees because the bylaws do not specifically provide for them.

Affirmed.

/s/ Matthew S. Ackerman
/s/ Adrienne N. Young
/s/ Daniel S. Korobkin